21-519 and 21-591 Mr. Fay. Thank you. Good morning. May it please the court, my name is Peter Fay, with the law firm of Duperpepe and Monteith, and I represent the defendants, LaserPerformance and Quarter Moon, Inc. We're asking the court to do three things this morning, and I'd like to outline those for you and then talk about them in more specific detail. First, with respect to the Lanham Act claims against QMI or Quarter Moon, Inc., we're asking this court to vacate the Award of Profits and to remand the case to the district court to reconsider its Award of Profits for several reasons. First, we believe the award was clearly erroneous, based on a factual finding that QMI lacked authority to manufacture and sell these laser sailboats with the builder plaques that had Bruce Kirby's name on them. We believe the award was based upon an incorrect conclusion of law about the status of the builder agreements that Quarter Moon had with Global Sailing during the period of time. QMI did not know, and I'm sorry, when I say QMI, Quarter Moon, Inc., just to be clear. Assume that we're familiar with the record. Thank you, Ron. QMI did not know that there was any trademark rights in the name Bruce Kirby. QMI had contractual obligations to use the Bruce Kirby name on the plaques that it manufactured in accordance with its agreement with Global Sailing. And also, the trial court failed to adequately analyze the factors that it was required to consider under Four Pillar Dynasty. Second, with respect to the misappropriation of name claim against laser performance, we're asking the court to reverse the trial court's decision denying the defendant's motion for a new trial and to remand this case with directions to enter an order for a new trial for laser performance. And that's because the damages awarded by the jury and by the court were clearly excessive because there was no evidence to prove that laser performance had derived any commercial benefit from using the name Bruce Kirby on the plaque that was installed on the boat. There was no evidence that any sales of these laser sailboats were proximately caused by the use of the name. There was no evidence concerning what the sales were, the processes that took place in Europe, the Middle East, and Africa, which were the territories in which laser performance was selling these boats. Bruce Kirby, who admittedly had left the business in 2008, there was no evidence that he knew anything about the sales processes during these years. Can I ask one of the questions I'm struggling with on this sort of absence of evidence argument? Because there's a little bit of evidence in the form of Mr. Kirby's testimony about the importance of the plaque and that that's what people look for. And then there's no contravening evidence. I guess I'm wondering whether the absence of all the evidence you've described about consumer interests in the plaque and the qualifying boat and purchasing habits, at some point doesn't the burden shift to you to come in and say, his broad testimony about people valuing this plaque doesn't take into account, here's the evidence we have. I don't believe so, Your Honor, because the burden of proof always remains with the plaintiff to prove the elements of his case. And this was a two factual witnesses. There's much discussion of how long this case lasted. We finally get to trial in 2020. Why isn't Mr. Kirby's testimony sufficient? Because all he said is that some unidentified people, not how many or who or where or who would look for these boats, look for these plaques because they wanted to know that the boat was eligible to race. Not everybody who buys a laser sailboat races them. You only need the ISAF plaque if you're racing it in an ISAF sanctioned event. Why is that insufficient? In other words, he was subject to cross examination. The jury had that in front of it and made a determination. The judge also had that in front of him, Judge Meyer, and made a determination that that was enough. Why, so tell me, what do I write to say that Mr. Kirby's testimony was not enough with respect to the damages? Because it was so woefully inadequate, Your Honor. It was to say that some people- So woefully inadequate, but why? What have we said? Because it leads to, I'm sorry. If I make a general statement that I was damaged, and the jury is able to see me and hear me, and it doesn't have to be much. It wasn't anything. It was just that some people, some people would look for these plaques. Some people- We don't know whether those- That's what makes them racing eligible. That's what makes it the genuine article, right? Doesn't that seem to suggest that the default should be that a customer who's trying to buy one of these boats would want the certification, would want the seal? I mean, is there anything in the record that suggests that a lot of the customers of these boats were not interested in races and would be indifferent to the seal? There wasn't even any evidence that any of the buyers in Europe, the Middle East, and Africa raced these boats, where these races took place. There were hundreds of thousands of these boats sold over the years. There weren't hundreds of thousands of boats being raced. So clearly, a lot of these boats are being sold for pleasure purposes or for racing in non-sanctioned events. Again, it's only in the sanctioned event that you would need the ISAF plaque. The builder plaque that has the design by Bruce Kirby, a statement of fact that's accurate, was not. It's the ISAF plaque that sanctions it for ISAF races, not the builder plaque. So again, the fact that somebody somewhere might have looked for these plaques, we don't know whether those people who looked for the plaques even bought a boat. There's no evidence that they bought any boat. So again, no cross-examination, because what was there to cross-examine? Mr. Kirby testified that he had left the business in 2008. He testified that customers looked for the plaques. Wouldn't the cross-examination be, well, what customers? What percentage of the customers of these kinds of boats are you talking about? Are there people in the Middle East and Africa who are not interested in racing and don't care about the plaques? I mean, isn't that, I mean, you suggested a line of cross-examination right here in the last few seconds. So wouldn't that be what you would have asked? Theoretically, any question could have been asked on cross-examination, but when the evidence presented by the plaintiff who has the burden of proof is insufficient to give the jury sufficient evidence beyond pure speculation, pure speculation. All these years to develop the case, and the only witness they called to testify about what potential buyers may have done was Bruce Kirby, who hadn't been in the business for at least three years prior to the offending event. There's no evidence that he ever visited the Middle East or Africa. How could he know what buyers in those territories were doing? There are a lot of products that are on the market by a particular designer, and it does seem like customers often really care that it's the genuine product that's made by that designer. So if somebody testifies, well, look, customers who buy this kind of thing, they want to make sure that it is the genuine article that's endorsed by the designer of the product. That seems like that makes some intuitive sense or would to a jury. I mean, wouldn't you have to say that's actually not the nature of this market? Well, I think, I guess I would liken it to you buy an Eddie Bauer vest. It has Eddie Bauer's name on it. We don't know who actually designed it, but it says Eddie Bauer on it. But you have to, if you want to establish that that's some kind of trademark infringement and that you're entitled to lost profits, you would have to show that the person who bought those vests was buying it not because of the color of it or the material or the fact that it provided warmth or maybe it was a good price or it was available or it came in different sizes that fit you, just mere fact that it says Eddie Bauer on it. And at least the Eddie Bauer's insignia is on the front lapel. We're talking about a name, a statement of fact designed by Bruce Kirby that was on a small plaque in the cockpit of a boat. And the plaintiffs want us to believe that all of the sales were due to just the name, that name on that plaque at the back of the boat that some people may have looked for. Well, people, I'm thinking a boat's a little different from an Eddie Bauer vest in the sense that you probably don't buy a boat without looking in the cockpit, right? I mean, do people- Again, I think that's speculation. We don't know why people buy a boat. It's not speculation if we're looking at the record, right? because we have testimony from one witness who's been immersed in this industry who says people look for the plaque. So the question I guess is whether that's so implausible that we're not going to credit it and treat it as inadequate. I think it is so implausible. That's the reality. That's what it comes down to. I think that if that's the sole basis, then that's totally implausible and the jury could have done nothing but speculate. I'm sorry. Yeah, I wanted to go back to one of the points he made before, but if you haven't gotten to the third one, maybe you should let us know what that is. Just, I was going to touch quickly on the misappropriation of name claim. It kind of ties into the same argument that there was no evidence of how many boats were sold and what that commercial benefit was. The third argument that we made was the lack of standing in terms of asserting the claims against QMI. And again, that's because it comes down to there's no actual injury that was claimed. There was no evidence of a damaged reputation, no testimony about inferiority of the product. There was just no evidence that there was any harm. And to simply say that, I think the court found standing on a very basic premise, which is that they were the trademark holder, but there was just no evidence of any actual injury. But he claims that there was harm, right? So he, Bruce Kirby? Yes. Well, he claims the harm, the only harm he claimed was the failure to pay royalties to a third party global sailing. Bruce Kirby suffered no harm that he claimed himself, and the judge instructed the jury on that. It doesn't dilute the value of his trademark if somebody is going around using it without a license? No evidence that there was any harm to the trademark whatsoever. So you're just saying that there needed to be separate evidence to show that the trademark was, that customers regarded it as a blessing? All of the boats that were sold were eight race eligible, complied fully with the laser construction manual, were genuine products. There was nothing, it was- That doesn't strip him of the standing. It may impact the claim. But I don't know that if you're a trademark registrant, you can't sue. If there's something that impacts the trademark. That's your argument, right? And that's what the district court found, your honor. We believe that the law requires more than just being a trademark holder. You have to show an actual injury. Thank you very much. You've reserved two minutes for rebuttal. We'll hear from Mr. Killer. Thank you. Thank you. Good morning, your honors, and may it please the court. My name is Robert Keeler from the law firm Whitmire IP Group, and I represent the appellees, Bruce Kirby, his estate, and Bruce Kirby, Inc. First, I just want to point out that it wasn't just Mr. Kirby's testimony that established that the sailors were looking for these plaques on the boat. Mr. Crane's testimony on joint appendix page 125, it's page 305 of the testimony, 19 to 24. He states very clearly, he's asked, so that's what laser performance, that's what their customers wanted to know, is that a boat was class legal, correct? He replied yes. And then he was asked because they wanted to race the boats in laser races, and he replied yes. So every customer, every buyer of these boats wants to race it in an official race? Even the buyers in the Middle East? I think the important point is that they want the boat to be class legal. That they want the boat to comply with all of the rules for the class, because the whole point behind the laser class is that it follows a one design rule, so that every boat is equal. None have an inherent advantage in the boat itself. That's the value of the boat in part, in large part. Correct. Well, that's what makes it, that makes sense for races, but if I'm buying a boat for recreational use, it's not like I care whether somebody who's also sailing next to me, but we're not in the competition, has a slight advantage or their design is slightly different, right? I don't think that's correct, Your Honor, because if I go and buy a car, let's say I go buy a Ferrari. I might not want to take that to the track, but there's still an inherent value in having a Ferrari and having a Ford, something like that. I want to show off that I got a Ferrari, and there's value to that. Correct. And that actually is what the other bit of testimony is partly about. Correct, Your Honor. Can I shift to the Lanham Act claim? Of course. I'm struggling with that a bit. And I want to make sure I understand sort of the chronology here. For a pretty long period of time, decades, QMI is licensed to use this mark, and in fact, obligated by contract to use this mark. The infringement theory is that at some point that ceased to be true, and from that point forward, they can be accountable for damages for infringing the trademark. The damages seem to be calculated on the theory that that point is the moment when they stopped paying the royalties, I guess, to the global sailing folks. And I'm trying to figure out what the legal basis for that would be in the face of a contract that provides a process for terminating the contract. It doesn't automatically dissolve upon default. There's a process. Yes, Your Honor. So essentially what happened here is for years, you're correct, that there was a contract that authorized QMI to build the boats according to the constructor's manual. And when that contract was sold to Global Sailing, the trademark rights were not sold with it. Bruce Kirby. But the trademark wasn't sold, but certainly as Global Sailing acquired the right to continue to license, and in fact, require the use of this mark, right? Well, that would be a contract between third parties at that point, Your Honor, not between Bruce Kirby. So is it your position that Global Sailing had no authority from the moment of that transaction to require compliance with the contract that had been assigned to them? I think what happened here was Bruce Kirby sold the rights under the construction manual and retained the trademark. And in doing so, he allowed a time period to go forward where the name was still used on the boats. And where is that in the record, that there was some part of the assignment that provided a time, this is new to me. It wasn't written, Your Honor, but that's how the facts played out. I'm sorry, so you're saying that actually Kirby could have just sued the builders at any time, even when they were paying royalties to GSL for using the mark, because they didn't have the right to do that? Yes, Your Honor. So GSL was not a licensee that had the right to authorize the builders to use the mark? No, they did not retain a license to mark. So you're saying that they were infringers even before they stopped paying royalties? And it was just because of the- Potentially. Bruce Kirby deciding not to sue them, that they were liable for damages? Potentially. And how did they know they were infringers, having had decades of license to do this? And understanding that somebody's now stepping in the shoes. It's hard for me to understand why these folks would pay two and a half million for the right to royalties if the customer, the QMI could just simply stop using the plaque right away and there'd be no royalties. But- So less than two years after he sold his rights, in 2010, Bruce Kirby and Globals demanded that ILCA stop issuing plaques with Bruce's name on them, with Mr. Kirby's name on them, because there were no royalty payments being made. And he no longer wanted his name on the boats. So he said, well, first of all, his name's on the boats in two places. Correct. Actually, one's a corporate name, right, and one's his individual name. And he communicates vis-a-vis the ILCA plaque. How does him saying to ILCA, I don't want you to give that plaque, communicate to QMI, even though you've been licensed and in fact required by contract to use the builder's plaque for all these years. And even though I'm not actually communicating to you directly, and even though the communication that I'm making doesn't address the builder's plaque at all, you're supposed to know that you're no longer privileged or licensed to use the builder's plaque. In that case, your honor, while QMI feigns ignorance of this letter and of the corresponding, there was a lot going on behind the scenes here. And essentially what happened is they stopped paying the royalties and made up a dispute between Global and Bruce Kirby as to who was the proper recipient of those royalties. And at the same time, QMI was working with ILCA to remove Bruce's name from the plaques. Which they're entitled to do, right? Correct. That's not an infringing thing. No. So why does the fact that they want to get out from under this obligation to continue to use his name suggest that they're on notice that they no longer have license to use his name? If anything, it seems like they don't want to use his name. They're working hard to not have to use his name. And that's being used as evidence that they knew that they- They knew that the use of his name would be trademark infringement, your honor, and misappropriation of his name. And they knew that because? Because throughout this whole process, it was very clear that Bruce Kirby had trademarked his name and that the Boche used his name on it in a way that suggested his authorization. And his consent to the use of his name. He clearly communicated his lack of consent to use his name to QMI and laser performance. I know he did in October of 2012, but I'm wondering when before that he did. At least as early as March 2010 when he asked ILCA to stop issuing. So asking ILCA to stop issuing the ILCA plaque communicates clearly to QMI that not only are you not contracting, I mean, doesn't QMI still have a contractual obligation to use the builder's plaque? If they want to sell class legal boats, yes, but they didn't have to. That was a choice they made for themselves to willfully infringe on this trademark. Can I just clarify something about the nature of these contracts? I mean, you told us a moment ago that the entire value of the boat is really bound up in the plaque because that's what customers look for. But then you also said that when Kirby sold his interest in the building contracts to GSL, that he did not give them the right to license the counterpart to use the plaques. So basically, that contract was worthless because it didn't give the builders the right to use the plaques. No, Your Honor. You said even when they were paying royalties, they didn't have the right to put his name on the boats. The contract was not worthless, though, Your Honor. The contract still authorized them to build boats under the construction. With the design, but you just told us a moment ago that just having the design is not enough because customers look for the Bruce Kirby name. Right. But you're saying that actually the builders' contracts with GSL didn't give them the right to use the name. Isn't it weird that the contract obliged them to use the name but couldn't have given them the right to use the name? No, Your Honor, because even after Bruce Kirby's name was removed from the ILCA plaque and from the builder's plaque, the boats were class legal then when the rules were changed. Well, that's when the rules were changed. Correct. But when the interest in the contract was sold, they were living in a world in which that was not what the rules were. The rules required the use of the name, right? And the contract obligated the builders to use the name. But you're telling me that the contract did not authorize them to use the name. So Bruce Kirby could have sued for misappropriation of name and trademark infringement even before they stopped paying royalties. Is that right? Correct, if he did not authorize the use of his name or his trademark. But you're saying he didn't. So GSL was not authorized or didn't have a license that allowed them to authorize their counterparty to use the name. So even though the contract obliged the counterparty to use the name, that was an infringement. It could have been, Your Honor. But why do you keep saying it could have been? Because that's not how the facts played out here. Well, he didn't sue over it, but your position seems to be that it was an infringement all along. Correct, if he did not approve of the use of his name, he could have asked them to stop and- It was forbearing from pursuing an infringement claim for some period of time. Correct, he did not for a period of time. But he's telling them to pay the royalties to GSL, right? Correct. He's assigned his interest in the contract to GSL. Correct. So why wouldn't the builders understand that if they complied with the contract that they could use the mark? Because there was no, it was very clear at the trial court that Bruce Kirby retained the rights to his trademark and his name, even after the sale. Well, you can own your trademark and license someone else to do stuff with it. Correct. Right, and I think what you're saying is not only did he retain the actual ownership, but that no license to allow builders to use the plaque passed to Global Sailing with the assignment of the contract that required builders to use the plaque. And that, I'm having a hard time understanding. Correct, and I think the important part here is his consent didn't have to, it didn't have to happen once and be continuous for the rest of the time. He can choose at any point to withdraw his consent to use his trademark or his name. Right, and I'm with you that he did that in October of 2012. I'm still puzzled at the notion, you've said that he could have pursued it sooner. What you're really saying is not that he could have sued sooner, but that he could have indicated sooner that he no longer consented to the use of his name. And then if they continued, then he could have pursued an infringement action. Well, Your Honor, the totality of the record at the trial court shows that he had clearly communicated that if QMI and LPE were not paying their royalties, they did not have consent to use his name. No. I'm sorry. No, please. What is the period that the damages covers here? I don't want to misspeak. The damages for the trademark infringement claim were through April 2013 and began. Is it possible that it's February 1, 2011? Correct, thank you, Your Honor. So we have in the record, or at least there was an exhibit that was introduced, which was an agreement between GSL and Bruce Kirby and Bruce Kirby Incorporated. And it does include a sale and transfer intellectual property assets. There's a license that says that's the seller, which is Kirby, hereby grant to buy or not exclusive to perpetual royalty free license to license intellectual property assets and to use the name Bruce Kirby only in advertisements, marketing, or other literature regarding the Kirby sailboat. But you're saying that that's a license that allowed GSL to use it itself, but GSL was not authorized to license the counterparty to the contract to use intellectual property? Correct, and that's, I would say, a normal- So GSL was a licensee, but GSL was not authorized to license the builders? Your Honor, what I'll say is that the trademark ownership did not move with the contract. The trademark ownership did, but you're saying not even the authority to license a use of the trademark? No, there is no sub-licensing provision in that contract. The GSS could not sub-license the, is that right? Correct, no, they could not, they couldn't sub-license. So can I ask just about the point that opposing counsel had brought up, which is a separate point,  No, Your Honor, under the principles of standing, the injury to the trademark owner in his commercial reputation, in his goodwill, is enough to establish the harm. Well, that is an injury, right? Correct. And so then the damages for the Lanham Act violation are supposed to be compensatory, right? Correct, to an extent. There is an element of deterrence. So why would all of the profits that were made from selling all of the boats be compensatory to Kirby for harm to him? Well, it could also have a deterrent effect under four pillar. The profits could be used to punish, say, a willful infringer like we have here. So because it's a willful infringer, you're saying you did not need to show that the damages were purely compensatory? No, Your Honor. Was there harm to the mark? Were customers confused? Was the mark diluted? Your Honor, you don't need to show actual confusion in order to get an award of profits. Essentially, the mere fact that he loses control over his mark and there's products in the marketplace that bear his mark that are not his, he can't control the quality or his reputation with them, is enough to support the harm. Because the jury determined that the infringement was willful. Correct, Your Honor. Can I go back to the timing a little bit? So February 1st, or a different date, but February 1st, 2011 to April 2013, what happened on February 1st? The last payment made by QMI for their royalties, I believe, was January 27th, 2011. And then there's the letter of complaining. Correct. Thank you very much. Mr. Fay? Thank you, Your Honor. Yeah, that's one of the problems that I didn't get to mention. If this court affirms the district court's decision, what Your Honor alluded to, which is exactly that, GSL really acquired nothing. Because for them to say that GSL didn't acquire a right to license or sub-license the use of the Bruce Kirby name is contrary to the documents. They were required to have that Bruce Kirby name on the plaque. They were required to give credit to Bruce Kirby in their marketing and wherever possible. So it is true that the contract required them to do that. But do we have something in the record that shows that GSL had the right to authorize it? So like I said, I have this agreement. We have this agreement between Kirby and GSL. And it does seem to license GSL to use the mark. But it doesn't obviously authorize them to license it to a third party. The agreement transferred all of the builder agreements. And it was the builder agreements that then licensed the builders. And those were not only these defendants, but there were builders in Japan and Australia who also were building these boats pursuant to these builder agreements. And these builder agreements were created by Bruce Kirby and Bruce Kirby, Inc. themselves. So they're the ones that actually put this requirement in writing to use his name on the boats. And then now they're claiming that somehow they were allowed to, even though they sold all those rights for $2.6 million, that they somehow retained the right to stop basically production of race eligible boats at least, because they could keep any of the builders from putting their name on the boat. And that's what Global Sailing had purchased. So- So how does that fit in with the particular liability here? Does it show that the infringement was not willful because they relied on the contracts and understood the transfer? Or was it, or is there some other argument? Yeah, well that's part of it, absolutely. Even if that's right. So even if the builders were under the impression that GSL was authorized to license use of the mark, certainly once you've reached the contract with GSL, by not paying royalties, you would not think that you're operating under a license as a counterpart of a GSL anymore, right? Well, the failure to pay- And did the builders not understand that Kirby still had ownership of the trademark? Even if they thought GSL was a possible licensor, they understood that Kirby owned the mark, right? The builders had no idea that BKI had a trademark in the name Bruce Kirby until they were sued. That's the first evidence we have of any mention of a trademark. All the correspondence that went back and forth about the payment of royalties that are in the record, nothing about a trademark, nothing about you're not allowed to use my name, it was like I want you to stop building these boats because you're not paying royalties to global sailing. So even when they had the opportunity to advise the builders that there was a trademark or that there was an issue with them using the name Bruce Kirby on the boat, they didn't take that opportunity. Those letters were written both by Bruce Kirby himself and by his counsel. Never once did they mention anything about a trademark. The letter that went to ILCA, there's no evidence that letter ever went to QMI or anyone else. It went to- But even if it did, let's assume it did, right? Because I think that the argument is, given that they were all sort of working together to try to change the rules, that it's a reasonable inference that QMI was aware of the letter that went to ILCA. What did the letter that went to ILCA communicate to QMI if QMI had the letter? Yeah, I think just that they wanted them to stop issuing the plaques because they weren't paying royalties. Right, the ILCA plaque. I'm sorry? The ILCA plaque. The ILCA plaque, correct. Yeah. Doesn't that communicate that Bruce Kirby has some interest in the use of his name in the plaque and therefore has some authority to say stop issuing the plaques? The ILCA or ISAF plaque doesn't have Bruce Kirby's name on it. The Bruce Kirby name designed by Bruce Kirby is on the builder plaque. So the letter to ILCA saying stop issuing ILCA plaques doesn't even go to the trademark. The builder plaques get those themselves. I'm sorry? It has a corporate name on it. Bruce Kirby Inc., correct. Yeah. So doesn't that suggest that he has some interest in that? Again, no mention of a trademark or the use of his name. They wanted to stop issuing a plaque that had a corporate name on it. I don't know, even if that letter got to us, how that would be somehow noticed to us that we're infringing a trademark or that we no longer have permission to use his name on the plaque, which was required by all of the agreements. Your position is basically that you might have been breaching a contract with GSL, and so you would have known that you might be liable to GSL for breach of contract damages. Yeah, it was a condition of default. GSL, the record shows, GSL sued us. That went to a stipulated judgment for those royalties. But GSL never terminated QMI's contract. So we remained a licensed builder throughout. When we got sued, we stopped using the trademark. When we found out that it was a trademark. Before that, we never knew. So it goes to the willfulness. It goes to whether or not there was even a trademark infringement in the first place. But- Did the jury have all this in front of it? In other words, this dispute? The jury did. Okay. Thank you very much. Thank you. Thank you very much. We'll reserve the decision.